**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC. | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:17-CV-01972** |
| **v.** | ) | |
| | ) | **District Judge Franklin U. Valderrama** |
| HYTERA COMMUNICATIONS | ) | |
| CORPORATION LTD. & HYTERA | ) | **Magistrate Judge Jeffrey I. Cummings** |
| COMMUNICATIONS AMERICA | ) | |
| (WEST), INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the motion by defendants, Hytera Communications Corporation Ltd. and Hytera Communications America (West), Inc. (collectively "Hytera"), to compel production of documents that plaintiff Motorola Solutions, Inc. has withheld on the basis of attorney client privilege. (Dckt. #226, 227.) Plaintiff filed a response on March 22, 2021 (Dckt. #231), to which defendants replied on March 29, 2021 (Dckt. 233). For the reasons set forth below, defendants' motion to compel discovery is denied.

**I.    BACKGROUND**

Motorola filed this lawsuit in 2017 alleging that Hytera has infringed on seven patents related to digital, two-way radio technologies: the '284, '169, '869, '701, '991, '972, and '111 patents (collectively, the "Patents"). (Dckt. #1.) Hytera subsequently brought a counterclaim against Motorola, seeking declarations of invalidity and noninfringement. (Dckt. #105.)

Motorola has produced approximately three million documents over the course of discovery in this case and prior litigation between the parties. (Dckt. #231 at 6.) Included in this production were more than 100 "invention disclosure forms" ("IDFs") and associated materials.

IDFs are documents completed by Motorola engineers about any new technical development they wish to patent. (Dckt. #227 at 3.) They include "key dates, inventor names, a technical description of the innovation or problem solved, prior art known to the engineers submitting the IDF, and the expected business impact of the technology." (*Id.* at 5.) Once completed, each IDF is assigned a technical reviewer (a Motorola engineer) to evaluate the invention, search for prior art, and create a presentation summarizing his or her findings. (*Id.* at 4; Dckt. #233-4 at 4.) The reviewer then presents the invention to one of Motorola's patent committees, which are comprised of patent attorneys, engineers, business representatives, and portfolio managers. (Dckt. #227-3 at 13-14.) Although the committees are chaired by a lead technologist, they work "at the direction of a lawyer." (Dckt. #231-1 at 4.) After the reviewers' presentation, committee members discuss the IDF and determine whether to seek patent protection for the invention. (Dckt. #231 at 12.) While the committees generally use a consensus-based decision-making model where every member has a vote, the patent attorneys have veto power over the committees' decisions. (Dckt. #231-1 at 4.)

When it was brought to Motorola's attention that certain IDFs had been disclosed over the course of this and prior litigation, Motorola typically asserted that the disclosures had been inadvertent and clawed back the IDFs on the grounds of attorney-client privilege. (Dckt. #227 at 2.) Motorola has never produced, inadvertently or otherwise, the IDFs for the seven Patents or the patents Hytera suggests constitute prior art. (Dckt. #227 at 3.) Hytera now seeks to compel the production of the IDFs and their corresponding patent committee presentations for (1) the seven Patents; (2) the patents Hytera has identified as prior art; and (3) four IDFs related to the '169 patent. (*Id.*)

## II.     LEGAL STANDARD

A party may file a motion to compel under Federal Rule of Civil Procedure 37 whenever another party fails to respond to a discovery request or when its response is insufficient. Fed.R.Civ.P. 37(a).  Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules.  *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D.Ill. 2018).  Rule 26 provides that the "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed.R.Civ.P. 26(b)(1); *see Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F.Supp.3d 916, 924 (N.D.Ill. 2019) ("Relevance focuses on the claims and defenses in the case, not its general subject matter.").  Discoverable information is not limited to evidence admissible at trial.  Fed.R.Civ.P. 26(b)(1).

## III.     ANALYSIS

Hytera argues that Motorola's IDFs are not privileged because they are "created for purposes other than legal opinion or services."  (Dckt. #227 at 9.)  Hytera further contends that even if the documents are privileged, Motorola has repeatedly waived that privilege.  (*Id.* at 13.) As explained below, the Court disagrees with Hytera's assertions.

### A.     Motorola's Invention Disclosure Forms are generally protected under the attorney client privilege.

The attorney client privilege protects communications between attorneys and their clients.  It exists, in part, to enable attorneys "to give sound and informed advice."  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).  The party invoking the privilege bears the burden of establishing that the communication was made for such a purpose.  *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983).  The first step of the privilege analysis is to determine what law applies.  Federal Circuit law governs matters in patent cases that concern questions of

substantive patent law. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-04 (Fed. Cir. 2000). Because an IDF is "unique to patent law" and "clearly implicates substantive patent law," Federal Circuit law is controlling as to whether attorney client privilege applies here. *Id.* at 804.

In *Spalding*, the Federal Circuit held that an invention record constitutes a privileged communication "as long as it is provided to an attorney for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding." *Id.* at 805 (internal quotations and citations omitted). The fact that a document contains technical information does not preclude the assertion of privilege because "requesting or providing legal advice in preparing a patent application necessarily requires evaluating technical information." *Medline Industries, Inc. v. C.R. Bard, Inc.*, No. 14-cv-3618, 2016 WL 307310, at *3 (N.D.Ill. Jan. 26, 2016). Furthermore, the document need not expressly request legal assistance, so long as "the overall tenor of the document indicates that it is a request for legal advice or services." *In re Spalding*, 203 F.3d at 806. When such a request is apparent, the entire document is privileged and courts need not "dissect the document to separately evaluate each of its components." *Id.*

Motorola asserts that its IDFs are analogous to the invention records in *Spalding* and Hytera does not contest this characterization. The critical difference, Hytera argues, is that while the Spalding invention records were sent directly to the company's in-house patent counsel for review, Motorola's IDFs are submitted to a patent committee and undergo a review process that is "decidedly non-legal in nature." (Dckt. #227 at 11.) Accordingly, the question before the Court is whether Motorola's patent committees serve a primarily legal purpose when reviewing IDFs, like the in-house patent counsel in *Spalding*. The Court finds that they do.

Although they involve substantial technical considerations, questions of patentability are, generally, legal inquiries. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). And while Hytera

is correct that invention reports are not *per se* privileged under *Spalding*, "an invention report *almost always* is a document prepared primarily for legal advice (i.e. procuring a patent)." *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, No. 02-CV-6564-T-F, 2006 WL 1495503, at *3 (W.D.N.Y. Apr. 21, 2006) (emphasis in original) (further noting that "it is difficult to imagine an invention report that would not be privileged"). This remains true when the determination of patentability is made with the assistance of technical experts. In *Cal. Inst. of Tech. v. Broadcom Ltd.*, No. 16-cv-3714-GW(AGR), 2018 WL 1468371, at *2 (C.D.Cal. Mar. 19, 2018), for example, the court considered "invention disclosures" that had been submitted to Broadcom's "Patent Review Committee." The committee's role "was to make individual patenting decisions on specific inventions submitted to it," and provide legal and technical input regarding patent procurement strategies. *Id*. at *2. Although the committee included attorneys, paralegals, and engineers, the non-attorneys were present to "assist the legal team in reviewing the submission and assessing its patentability." *Id.* at *3. It was the attorneys who ultimately determined whether Broadcom would seek to patent the invention. *Id*. at *2.

Other courts have similarly held that IDFs were privileged despite being subjected to non-attorney review. *See PolyVision Corp. v. Smart Technologies Inc.*, No. 1:03-CV-476, 2006 WL 8454894, at *4 (W.D.Mich. June 9, 2006) (finding that an invention disclosure form was privileged where it was submitted to a patent committee – the composition of which was not discussed – for approval before being sent to in-house counsel); *Carl Zeiss Jena GMBH v. Bio-Rad Laboratories, Inc.*, No. 98Civ.8012(RCC)(DFE), 2000 WL 547047, at *1 (S.D.N.Y. 2000) (fact that administrative director reviewed IDFs before sending them to patent attorney did not destroy the attorney privilege where she was employed by the same entity employing the attorney).

5

The Court finds that the role played by Motorola's patent committees is similar to the role played by in-house patent counsel in *Spalding* and the Patent Review Committee in *Broadcom*. Therefore, the IDFs submitted to it are also privileged. This finding is largely supported by the deposition and subsequent declaration of Daniel Bestor, in-house patent counsel at Motorola, which consistently indicated that Motorola's IDFs were prepared and submitted primarily for the purpose of obtaining legal advice on patentability. First, Mr. Bestor stated that each patent committee "works at the direction of the lawyer on the committee." (Dckt. #231-1, Bestor Decl., at 4.) These lawyers can override the decision of other patent committee members as to whether a patent should be pursued. (*Id.*) When asked about the purpose of input from non-attorneys on the committees, Mr. Bestor answered that this information was requested by the attorney and "is helping the attorney form his or her legal opinion." (Dckt. #233-2, Bestor Dep., at 4.) The fact that Motorola's patent attorneys train engineers on how to search for prior art when completing IDFs also supports a finding that the documents serve a primarily legal purpose. (Dckt. #231-1, Bestor Decl., at 2.) Furthermore, Motorola's demonstrated efforts to maintain confidentiality over IDFs weigh in favor of a finding of privilege. Motorola stores IDFs in a secure database so that each IDF is only accessible to the engineer who created it and the patent committee members responsible for reviewing it. (Dckt. #231-4, Doutre Dep., at 9; Dckt. #227-2, Senese Dep., at 8.) Motorola policy also "forbids" sharing IDFs outside of the company without permission. (Dckt. #231-1, Bestor Decl., at 4.)

Hytera argues that by characterizing the committees' purpose as legal, Motorola both misinterprets the relevant law and misrepresents the relevant facts. Regarding the law, Hytera suggests *Raytheon Co. v. Cray, Inc.*, No. 2:15-cv-01554, 2017 WL 2426266, at *2 (E.D. Tex. June 5, 2017) is more persuasive than *Broadcom*. However, the Court finds this case is

distinguishable where, unlike here, Raytheon's "invention questionnaires" were reviewed exclusively for business-related considerations before ever being submitted to a patent-focused committee. Only if Raytheon's "Invention Review Subcommittee" approved of an invention "on its technical merit," would the corresponding questionnaire be submitted to the company's "Patent Committee" for "broader review with increased focus on the business justification for filing a patent application or protecting the invention as a trade secret." *Id.* at *1. For this reason, Raytheon itself argued that its own questionnaires were *not* privileged. *Id.* Hytera asserts that Motorola's use of technical reviewers, who evaluate IDFs and draft a presentation before inventions are presented to the full committee, constitutes a similar preliminary level of non-legal review. (Dckt. #227 at 11.) Unlike in *Raytheon*, however, Motorola's technical reviewers evaluate IDFs using the same criteria as the patent committees themselves. Indeed, they evaluate them in their capacity as patent committee members. (Dckt. #233-4, Bohn Dep., at 3.)

Hytera also asserts that, like the committee in *Raytheon*, Motorola's patent committee serves a business and technical, rather than primarily legal, purpose. (Dckt. #227 at 11.) To support this claim, it cites the deposition of Thomas Senese, a former patent committee member, who described the committees' review process as follows:

> In a generalization of the process . . . the disclosure is evaluated on its merits of value of becoming a patent. So you determine . . . is the proposal being submitted, is it viable? You . . . try to determine . . . is it going to be useful for the business, you know, in what capacity. . . . So that's all reviewed and, you know, the lawyers have input, too, as to whether they think they can make reasonable claims based on what's being proposed.

(Dckt. #227-2, Senese Dep., at 5.) Hytera neglected to note that Mr. Senese later clarified that the business team typically "had very little input into patent committee meetings." (*Id.* at 6.) Under the clear language of *Spalding*, a committee's consideration of an invention's business

7

impact does not foreclose a finding of privilege, so long as it is not the primary consideration. A committee's focus on an invention's technical characteristics is even less relevant, as legal and technical considerations are inherently intertwined when considering patentability. *See Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 202 (E.D.N.Y. 1988) ("The domain of the patent lawyer is a highly technical one. The determination of whether an invention is new, useful and unobvious necessarily requires an analysis of the technical aspects of the invention, which in turn must be compared to the technical aspects of the prior art.").

The other cases cited by Hytera are even more readily distinguishable. In *Chen v. Jung*, No. CV 18-2015, 2018 WL 7500275, at *1 (C.D.Cal. Dec. 27, 2018), the invention report at issue was initially submitted to the UCLA Office of Intellectual Property, which did not employ a single attorney. Six weeks later, the UCLA employees decided to move forward with the invention and sent the form to outside patent counsel. *Id.* Based on this process, the court inferred that the "initial round of decision-making by non-attorney employees . . . must focus primarily, if not entirely, on non-legal issues like the economic and technical viability of an invention." *Id.* Conversely, as noted above, the testimony from Motorola employees indicates that the primary purpose of Motorola's patent committees was to collect information that would allow its attorneys to make a legal determination regarding patentability.

Hytera also cites *Space Systems/Loral, Inc. v. Lockheed Martin Corp.*, No. C 96-3418, 1999 WL 33219285, at *1 (N.D.Cal. June 22, 1999), a case that has never been cited by another court. In *Space Systems*, the court appears to adopt the narrow view that a document cannot be privileged unless it is kept strictly confidential to a company's attorneys and legal department. This misstates the test for privilege. The central inquiry is not who possessed a communication, but whether it primarily requests or gives legal advice. *In re Spalding*, 203 F.3d at 805; *see also*

*Baxter Travenol Laboratories, Inc. v. Abbott Laboratories*, No. 84 C 5103, 1987 WL 12919, at

*5 (N.D.Ill. June 19, 1987) ("[T]he mere fact that a document is sent to many non-legal and few

legal personnel is not determinative of whether it is privileged.").  Accordingly, this Court finds

the analysis in *Space Systems* to be unpersuasive and respectfully declines to follow it.

Turning to the facts, Hytera also argues that the Court should not consider Mr. Bestor's

declaration because it contradicted his own earlier testimony and the testimony of other Motorola

witnesses.  (Dckt. #233 at 5.)  Hytera asserts that three of Mr. Bestor's assertions in particular are

contradicted by other testimony.  For the reasons outlined below, the Court finds they are not.

First, Mr. Bestor stated that IDFs are "created primarily for the purpose of obtaining legal

advice regarding the patentability of a Motorola employee's invention and for the purposes of

preparing and prosecuting patent applications."  (Dckt. #231-1, Bestor Decl., at 3.)  Hytera

asserts that the following testimony contradicts this statement:

- o  The testimony of Barbara Doutre, Motorola in-house patent counsel, that she primarily relies on conversations with the inventor when preparing a patent and would not use the IDFs when prosecuting the patent.  (Dckt. #233 at 7.)

- o  The testimony of Thomas Senese, a Motorola engineer, that his first exposure to "legal advice" came after the committee decided to pursue an IDF.  (Dckt. #227-2, Senese Dep., at 12.)

- o  The testimony of Sanjay Karpoor, a Motorola engineer, that the committee is a "technical committee," which reviews "how good the invention is."  (Dckt. #233-6, Karpoor Dep., at 3.)

- o  The testimony of Thomas Bohn, an inventor and committee member, that he "never worked with attorneys" when making decisions to pursue patent application.  (Dckt. #233-4, Bohn Dep., at 5.)

The Court notes that Ms. Doutre did characterize IDFs as documents primarily used by

the patent committees, rather than the attorneys drafting the patent application.  (Dckt. #233-8,

Doutre Dep., at 3.)  However, she later testified that she reviews all of the documents in

Lecorprio (the Motorola database where IDFs are stored) when preparing to meet with innovators to discuss their application. (*Id.* at 6.) This includes the IDFs and patent presentations. (*Id.*) Ms. Doutre further testified that she relies on the IDFs to determine what prior art to include in applications. (*Id.* at 7.) Thus, taken together, her testimony indicates that she always uses IDFs and their corresponding materials when preparing patent applications.

Mr. Senese's testimony that he did not work with attorneys to prepare IDFs also does not contradict the statement that the purpose of IDFs is primarily legal. As the Court has already noted, it is a communication's content and purpose, rather than its authors, that determines its privileged nature. Mr. Karpoor's characterization of the committee as "technical" is compatible with Mr. Bestor's claim because, again, in the world of patent law, technical and legal considerations are deeply intertwined. The fact that engineers on the committees may not fully understand the legal ramifications of a technical discussion does not mean the discussion is being held for non-legal purposes. Finally, Mr. Bohn's testimony that "[he] never worked with attorneys" was in response to questioning regarding the process of filing patents in other countries and not his participation on patent committees at issue here. (Dckt. #227-3 at 7.)

The Court also notes that the testimony from Mr. Bestor's deposition is largely consistent with this statement. When asked whether comments from the business and technical representatives on patent committees constituted "nonlegal input given to the patent committee," Mr. Bestor replied, "all that information is helping the attorney form his or her legal opinion." (Dckt. #233-2, Bestor Dep., at 4.) Taken together, then, the testimony of Mr. Bestor and other Motorola witnesses supports the inference that Motorola's IDFs are created primarily for the purpose of obtaining legal advice regarding the patentability of an invention.

10

Second, Mr. Bestor stated that "the patent committee works at the direction of the lawyer on the committee." (Dckt. #231-1, Bestor Decl., at 4.) Hytera asserts that the following testimony contradicts this statement:

o The testimony of Mr. Bestor that "patent committee management responsibilities" fall to Lee Proctor, who is not a lawyer and does not report to a lawyer. (Dckt. #233-2, Bestor Dep., at 3.)

o The testimony of Mr. Bestor that the process by which a committee decides to move a disclosure forward is "dependent on the patent committee and how the patent chair runs the committee." (Dckt. #233-2, Bestor Dep., at 5.)

o The testimony of Mr. Bestor that there are no "hard-and-fast rules" on how a patent committee is run. (Dckt. #233-2, Bestor Dep., at 5.)

o The testimony of Subhash Nair, a Motorola inventor, "that attorneys do not even always sit on the patent committees." (Dckt. #233 at 9.)

It should first be clarified that, contrary to Hytera's assertion, Mr. Nair did not testify that attorneys do not always sit on the committees. Rather, when asked whether attorneys were on patent committees, he responded, "I know that sometimes attorneys do sit in on the committee meetings," and "it's my understanding that they sit in on pretty much all committee meetings." (Dckt. #233-5 at 4.) Moreover, every other Motorola witness who was asked about the composition of the patent committees testified unequivocally that an attorney sits on each patent committee. (Dckt. #227-4, McDonald Dep., at 22; Dckt. #227-4, Lund Dep., at 17; Dckt. #233-2, Bestor Dep., at 3; Dckt. #227-2, Senese Dep., at 5-6.)

Furthermore, the fact that committees are run *by* Mr. Proctor and committee chairs does not refute Mr. Bestor's testimony that the committees are run at the *direction* of attorneys. Throughout his deposition, Mr. Bestor was adamant that any information provided during the committee meetings was "being requested . . . by the attorney in forming his or her legal opinion." (Dckt. #233-2, Bestor Dep., at 4.) Daniel McDonald, a Motorola engineer, also stated

11

that the committees were "overseen" by an attorney from the patent department. (Dckt. #227-4, McDonald Dep., at 22.) Accordingly, while it appears that the management of Motorola's patent committees is left to Mr. Proctor and the committee chairs, the evidence shows that the overarching purpose of the committees' meetings is to assist attorneys in determining patentability.

Third, Mr. Bestor stated that "[t]he attorney on the patent committee can, according to Motorola policy, override the decision of other patent committee members as to whether a patent should be pursued on a submitted invention." (Dckt. #231-1, Bestor Decl., at 4.) Hytera asserts that the following testimony contradicts this statement:

- o Mr. Bestor's earlier testimony that he could not recall if an attorney could override the other patent committee members' decision to proceed. (Dckt. #233-2, Bestor Dep. at 5-6.)

- o Mr. Senese's testimony that members of the committee had an "equal vote" on whether to pursue a patent. (Senese Dep., Dckt. #227-2, at 6)

- o Mr. Nair's testimony that "the committee debates on the merits of that disclosure and eventually makes a decision whether or not that disclosure is to be pursued for a full patent filing." (Dckt. #233-5 at 3.)[1]

Again, this testimony does not contradict Mr. Bestor's statement that attorneys have the power to override the decisions of patent committees, especially when considered within the context of other testimony. When originally asked whether the committee voted on whether to move forward with an IDF, Mr. Bestor stated that "it would be a decision made by the attorney or by an attorney in combination with others on the committee." (Dckt. #233-2, Bestor Dep., at 4.) Next, when asked whether the attorney could override other members' decisions, Mr. Bestor

---

[1] Hytera also asserted that Mr. Bohn testified "the entire patent committee votes on whether or not the IDF moves forward towards a patent application." (Dckt. #233 at 10.) In reality, Mr. Bohn testified: "It's more of a consensus, right? Not a formal – not a formal vote, you know. They reach a consensus." (Bohn Dep., Dckt. #233-4, at 4.)

stated, "I don't remember if I ever did that or not," but that he "believe[d]" he could. (*Id.* at 5-6.) Furthermore, Russ Lund, Motorola's former Vice President of Engineering, testified that the non-attorney committee members make a "recommendation" regarding patentability to the patent attorneys, indicating that the attorneys have the final say. (Dckt. #227-4, Lund Dep., at 17.) Because it appears this veto power is rarely, if ever, used, it is understandable that some committee members were unaware of the policy and may have perceived their vote as equal.

Accordingly, none of Mr. Bestor's testimony is directly contradicted by the record and the Court credits his testimony in reaching its decision. Considering these facts alongside the precedent outlined above, the Court finds that Motorola's IDFs are created for a primarily legal purpose and, therefore, protected by attorney client privilege.

### B. Motorola's Patent Committee Presentations are similarly privileged.

Hytera argues that the IDF presentations, which are created by technical reviewers and submitted to patent committees alongside the IDFs, are not privileged because (1) the reviewers who create the presentations are not attorneys, (2) when creating the presentations, the reviewers meet with inventors to discuss the IDF and acquire additional information; and (3) the presentations are entirely separate documents from the IDFs. (Dckt. #227 at 11.) However, "documents that are prepared specifically as an attachment to an invention report are usually prepared seeking the same legal advice or services as the invention report, namely, procuring a patent." *Eastman Kodak*, 2006 WL 1495503, at \*4. Where an attachment is created in connection with a privileged IDF and submitted for the same primary purpose of assessing patentability, the attachment will be similarly privileged. *Vantage Controls Co. v. Lutron Electronics Co., Inc*., No. 2:03 CV 488 TC, 2006 WL 539517, at \*2 (D.Utah March 6, 2006) (finding the entire "patent file," in which employees place notes and communications used to

facilitate patent applications, to be privileged). Here, testimony shows the presentations made by IDF reviewers were created and shared for the same purpose as the IDFs. Accordingly, they are also privileged.[2]

### C. Motorola has not waived its privilege over the IDFs at issue.

Hytera makes a three-pronged waiver argument: (1) Motorola waived its privilege over the four IDFs that it disclosed as attachments in an email from Robert LoGalbo (the "LoGalbo IDFs"); (2) Motorola waived its privilege over the '169 and '972 IDFs through the testimony of Motorola patent attorney Barbara Doutre; and (3) Motorola waived its privilege over *all* IDFs – including those for the Patents – by treating some IDFs as unprivileged during this and prior litigation between the parties.

> ### 1. Because Motorola's disclosure of four IDFs as email attachments was inadvertent, the attorney client privilege over these documents has not been waived.

On January 20, 2021, Hytera deposed Sanjay Karpoor, a Motorola engineer. (Dckt. #227 at 6.) During the deposition, Hytera introduced an email from Mr. LoGalbo, also a Motorola engineer. (Dckt. #227-5, LoGalbo Email.) The email was addressed to Alain Abbate, an inventor of the asserted '169 patent. (Dckt. #227 at 12.) The email was subsequently forwarded to Mr. Karpoor and Joe Phillips, a Motorola employee. (Dckt. #227-5 at 2.) The email contained four attachments. Although it was not apparent from the face of the email due to the

---

[2] Hytera notes that Motorola's privilege log did not include (1) the IDFs clawed back, (2) the IDFs sought under this motion, or (3) the presentations sought under this motion. (Dckt. #227 at 7.) During depositions, Motorola's attorneys would not allow witnesses to disclose whether these documents exist or if they are currently in Motorola's possession. If Motorola continues to assert that these IDFs and presentations are privileged, it must comply with Rule 26(b)(5) by providing a privilege log that includes them; simply objecting on the ground of privilege is insufficient. *U.S. ex. rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 235 F.R.D. 521, 523 (D.D.C. 2006); *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 7 (D.D.C. 2007). This updated privilege log should be submitted to Hytera by November 16, 2021.

nondescript file names, the attachments were IDFs.[3] (*Id.*) The email and its attachments had

been produced to Hytera in 2018 during a separate trial between the parties. (Dckt. #233 at 12.)

Motorola did not object to the use of the email in Mr. Karpoor's deposition and the IDF

attachments were neither introduced nor referenced by Hytera's attorneys. (Dckt. #231 at 7.) On

February 23, 2021, the same email was introduced during the deposition of Mr. LoGalbo. (Dckt.

#227-4 at 41.) This time, the attorney conducting the deposition referred to the attachments as

"disclosures" and asked very general questions about them.[4] (Dckt. #227-4 at 41.) Motorola

clawed back the IDFs the following day.

Hytera argues that Motorola's production of the LoGalbo IDFs was intentional and any

privilege over the documents has therefore been waived. Waiver is not bound up in substantive

patent law, so the Court applies Seventh Circuit precedent. *Medicines Co. v. Mylan Inc.*, 936

F.Supp.2d 894, 902 (N.D.Ill. 2013); *CCC Info. Services, Inc. v. Mitchell Intern., Inc.*, No. 03 C

2695, 2006 WL 3486810 at *3 (N.D.Ill. Dec. 1, 2006); *Abbott Laboratories v. Andrx

Pharmaceuticals, Inc.*, No. 05 C 1490, 2006 WL 2092377, at *3 (N.D.Ill. July 25, 2006). A

party may waive privilege by *voluntarily* disclosing privileged communications to a third party.

*Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012). If disclosure occurs, the

---

[3] As seen on the email exhibit, the documents are non-descriptively labeled as floorControl1.ZIP; floorControl2.ZIP; fair-optimistic-buffering[1].ZIP; fair-optimistic-buffering.ppt; and autonomous-distributed-fair-selection.ZIP.

[4] Portion of Mr. LoGalbo's deposition related to IDF attachments:
    Q: "Do you recall printing out disclosures on or about February 2, 2007, that are shown as
        attachments on the top of this email from Mr. Phillips to Mr. Karpoor, dated 3/2/2007?
    A: I'm sorry. You referred to these attachments as disclosures?
    Q: Yes
    A: Oh . . . Yeah, I don't know – yeah, because I don't see the term dis- – and I don't know. No, I
        don't remember. No, uh-uh.
    Q: Do you recall printing out any invention disclosures on or about February 2, 2007, related to
        floor control?
    A: No, I don't remember them at all, the – what the disclosure look like or – no, I don't
        remember.

Court must determine whether it was inadvertent. *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 387-88 (7th Cir. 2008); Fed.R.Evid. 502(b).

"Courts have not established a bright-line rule for determining whether a document was inadvertently produced." *Judson Atkinson*, 529 F.3d at 388 (internal quotations and citations omitted). Instead, courts look at the circumstances surrounding the disclosure and consider the following five factors: "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 117 (N.D.Ill. 1996). After considering these factors, the Court, in its discretion, finds that no waiver occurred under the circumstances here.

First, Motorola hired outside counsel to oversee the disclosure process and prevent disclosure of privileged documents. These attorneys, in turn, hired contract attorneys and trained them to identify privileged documents. (Dckt. #231-8.) The Court finds these precautions were reasonable. *See C.R. Bard, Inc. v. Medical Components, Inc.*, No. 2:12-cv-00032-RJS-DAO, 2020 WL 7264823, at *3 (D.Utah Dec. 10, 2020) (finding preventative measures reasonable "particularly where the [production] had been reviewed for privilege by a hired vendor").

Second, the time it took Motorola to rectify the disclosure, once it became aware of it, also supports a finding of inadvertence. Hytera notes that Motorola knew it had produced *certain* IDFs in 2018, when Hytera entered 40 IDFs into evidence during a separate trial between the parties. (Dckt. #233 at 12.) However, Motorola has not clawed back any of the IDFs that were admitted at trial. (Dckt. #231 at 7.) Accordingly, its failure to assert privilege over them in 2018 is irrelevant.[5] *See Upjohn*, 449 U.S. at 396 (finding the application of attorney client

---

[5] Similarly, Motorola has not clawed back any IDFs that were the subject of deposition testimony. (Dckt. #231, n.9.) Accordingly, these are likewise irrelevant to the waiver analysis.

privilege should be determined on a case-by-case basis). Hytera also argues that Motorola waived its privilege over the LoGalbo IDFs when it failed to claw them back immediately following the deposition of Mr. Karpoor. (Dckt. #233 at 14.) This, too, is unpersuasive given that the IDFs were never referenced or introduced during Mr. Karpoor's deposition and the attachments' generic file names gave Motorola no indication that they were IDFs. After Hytera's attorney described the attachments as IDFs during the deposition of Mr. LoGalbo, and thereby provided Motorola with notice that they had been inadvertently produced, Motorola clawed them back within one day. This constitutes a prompt effort to rectify the disclosure. *Wier v. United* Airlines, No. 19 CV 7000, 2021 WL 1517975, at *15 (N.D.Ill. Apr. 16, 2021) (party promptly requested the document's return one day after learning it had been produced); *Coburn Grp., LLC v. Whitecap Advisors, LLC*, 640 F.Supp.2d 1032, 1041 (N.D.Ill. 2009) (same); *Heriot v. Byrne*, 257 F.R.D. 645, 662 (N.D. Ill. 2009) (same).

Third, the scope of discovery and the extent of the disclosure also weigh in Motorola's favor. Motorola has produced more than *three million* documents over the course of this and prior litigation between the two parties. The fact that some privileged material slipped through the cracks and was inadvertently produced is unsurprising and, perhaps, even inevitable. *Judson Atkinson*, 529 F.3d at 388 (finding inadvertence where attorney produced over 25,000 pages of discovery in which one privileged memorandum was disclosed). Furthermore, out of the 150 IDFs disclosed to Hytera, only the four LoGalbo IDFs are directly relevant to the present litigation (indeed, these are the only previously disclosed documents sought in this motion).

Finally, the overriding issue of fairness weighs in favor of Motorola. The LoGalbo IDFs were not clearly labeled as invention disclosures and were attached to an email that, on its own, Motorola admits does not contain privileged information. Furthermore, Motorola's attorneys

have consistently instructed witnesses not to answer questions regarding the content of IDFs relevant to this litigation (although witnesses have been permitted to discuss the structure of IDFs more generally). Applying the relevant balancing test, the Court finds in its discretion that Motorola's inadvertent production of the LoGalbo IDFs did not waive its privilege over them.

> **2. Motorola did not waive its attorney client privilege over IDFs connected to the '169 and '972 patents.**

Barbara Doutre, the Motorola patent attorney who prosecuted the asserted '169 and '972 patents, testified during her deposition that she cites to every prior art reference included in an IDF when drafting the corresponding patent application. (Dckt. #233-8, Doutre Dep., at 7.) Hytera claims that Ms. Doutre made this statement in order "[t]o support her claim" that she has never withheld prior art from the United States Patent and Trademark Office ("USPTO") during patent prosecution. (Dckt. #233 at 15.) This is problematic, Hytera continues, because one of the central issues in this case is whether Motorola failed to inform the USPTO of material prior art when applying for the '169 patent. Hytera argues that "Motorola's reliance on [IDFs] to ward off invalidity claims and inequitable conduct while also claiming privilege is the classic 'sword and shield' tactic courts routinely reject," and Motorola therefore waived its privilege over the '169 and '972 IDFs. (*Id.* at 12.)

The Court first notes that Hytera mischaracterizes Ms. Doutre's testimony. She did not state that "she has never withheld prior art" from the USPTO, but rather that she has never omitted prior art listed on an IDF from a patent application. (Dckt. #233-8 at 6-7.) Unlike in the case relied on by Hytera, her testimony does not constitute the disclosure of any privileged information – much less the strategic disclosure of only privileged information that benefits Motorola. *Cf. Medicines Co. v. Mylan Inc.*, 936 F.Supp.2d 894, 904 (N.D.Ill. 2013) (finding that a party waived privilege where it buttressed its assertion by disclosing "a sliver of privileged

18

communication while shielding the rest from discovery").  Furthermore, Motorola has not relied on Ms. Doutre's testimony to rebut Hytera's defenses or counterclaims.  The mere suspicion that Motorola will rely on Ms. Doutre's testimony or any IDFs at trial is not sufficient to compel their disclosure at present.  *See eTool Development, Inc. v. National Semiconductor Corporation*, No. 2:08-CV-196-WCB, 2011 WL 12677159, *1 (E.D.Tex. Dec. 12, 2011) (in denying a motion to compel the production of IDFs, the court noted that the IDFs may contain information relevant to an argument expected to be made at trial, "but that is not the issue").  If Motorola ultimately argues that it could not possibly have withheld prior art from the USPTO *because* Ms. Doutre disclosed each and every reference listed in the IDFs, the privilege over those IDFs will have been waived.  *See In re EchoStar Communc'ns Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006) (finding that Echostar waived attorney client privilege over communications when it asserted the defense of reliance on advice of counsel).  Until such time, the IDFs associated with the '169 and '972 patents remain privileged.

### 3.  Motorola did not waive its privilege over the IDFs or presentations associated with the seven Patents by disclosing other IDFs.

Finally, Hytera argues that Motorola has waived attorney client privilege over its "entire body of IDFs" by disclosing 150 IDFs and failing to object to their use on numerous occasions. (Dckt. #233 at 2.)  Although a party's waiver of attorney client privilege over certain communications applies to all communications "relating to the same subject matter," *Appleton Papers*, 702 F.3d at 1024, this type of subject matter waiver does not encompass the IDFs at issue here.[6]

---

[6] Motorola's disclosure would not result in subject matter waiver under Seventh Circuit law or Federal Circuit law.  Still, the Court notes that most recent decisions apply Federal Circuit law to determine the *scope* of waiver in cases that implicate discovery issues unique to the context of patent litigation – even when the *existence* of waiver is determined by the law of the regional circuit.  *See Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 576 (N.D.Cal. 2008) (Federal Circuit law applied to

Subject matter waiver is limited to "situations in which a party intentionally puts protected information into the litigation in a selective, misleading, and unfair manner," Fed.R.Evid. 502 Advisory Committee Notes, and courts narrowly construe the scope of waiver in patent cases, *Kelsey-Hayes Co. v. Motor Wheel Corp.*, 155 F.R.D. 170, 172 (W.D.Mich. 1991). "There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Fort Janes Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349-50 (Fed.Cir. 2005); *see also In re Keeper of the Records XYZ Corp.*, 348 F.3d 16, 22-23 (1st Cir. 2003) (stating that case law "does not offer much assistance" in determining the scope of a waiver because of the fact-intensive nature of the issues presented). Furthermore, when identifying the scope of a waiver, courts "must consider the overriding issue of fairness." *Rowe Int'l Corp. v. Ecast, Inc.*, 241 F.R.D. 296, 302 (N.D.Ill. 2007) ("Though there is no doubt that Arachnid has waived its attorney-client privilege with regard to the subjects described above, expanding the scope of the waiver to include virtually every privileged communication related to all the patents-in-suit would be fundamentally unfair.").

Hytera suggests that subject matter waiver applies here because "Motorola cannot identify any difference between the numerous IDFs it has produced and those it has withheld." (Dckt. #227 at 5.) In its very next sentence, however, Hytera itself identifies the critical distinction: in particular, "the withheld IDFs relate to the patents in this case while most of those produced do not." (*Id.*) In other words, the IDFs at issue relate to a different *subject*. Hytera

---

determine the scope of waiver after a plaintiff voluntarily disclosed communications related to the preparation of patent applications because the disclosed communications "concern discovery issues that occur in the unique context of patent litigation"). Although the issue has not been directly addressed in this Circuit, IDFs are unique to patent law and the Court presumes that Federal Circuit precedent applies.

cites no case law to suggest that a party's disclosure of certain IDFs waives privilege over every IDF in that party's possession. Indeed, all case law identified by the Court indicates that this suggested scope is overbroad to the extreme. In *Rowe*, for example, the court found that testimony related to the preparation of the '302 patent application did not waive privilege over communications related to any other product. *Rowe Int'l Corp.*, 241 F.R.D. at 302. In fact, the "subject matter" of the waiver did not even extend to all communications regarding the '302 patent itself, but only narrow topics *within* that application (figure 2 of the application and the applications "claims related to song size"). *Id.* at 301-02.

Other courts have similarly narrowed the scope of subject matter waiver with regard to patent applications. *See, e.g., Shukh v. Seagate Technology, LLC.*, 872 F.Supp.2d 851, 854 (D.Minn. 2012) ("The [waived IDFs] describe inventions that Shukh claims he made while at Seagate. It is far from clear why . . . that limited subject matter should be expanded to embrace all inventions."); *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, No. 04-73461, 2006 WL 800740, at *1 (E.D.Mich. Mar. 28, 2006) (where plaintiff's production of the '756 patent IDF operated as a partial waiver, the scope of the waiver was limited to "the date and content of conception" of the patent and did not extend to any documents related to the invention, the drafting, filing or prosecution of the patent, any projects other than the '756 patent). Here, Motorola has consistently asserted privilege over the IDFs related to the Patents. There is no evidence to suggest that Motorola disclosed other IDFs in a selective, misleading, or unfair manner. Considering the issue of fairness and the narrow scope of waiver in this context, the Court finds that Motorola's behavior throughout the course of this and other litigation did not waive Motorola's privilege over the IDFs and patent presentations for the seven Patents.

## CONCLUSION

For the foregoing reasons, defendants' motion to compel (#226, 227) is denied.  By

November 16, 2021, plaintiff is ordered to produce an amended privilege log including the

claims addressed here.  The parties shall meet and confer to determine what further discovery, if

any, is necessary in light of the Court's ruling.  By November 16, 2021, the parties shall file a

joint status report setting forth what discovery has been completed, what discovery remains, and

a proposed schedule for the completion of any remaining discovery.  If Hytera maintains that it

requires additional time to complete discovery, it must submit a separate motion to the Court

requesting an extension.

**ENTERED:   November 2, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**